IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SANDRA LAOUNE HUFF, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.   3:19-CV-1625-L (BH) |
| ) | |
| ANDREW M. SAUL, ) | |
| Commissioner of Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | Referred to U.S. Magistrate Judge[1] |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.   BACKGROUND

Sandra Laoune Huff (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) under Title II of the Social Security Act (Act). (docs. 1;17.)

**A.   Procedural History**

On July 19, 2016, Plaintiff filed her application for DIB, alleging disability beginning on September 8. 2009. (doc. 14-1 at 60.)   Her claim was denied initially on October 13, 2016, and upon reconsideration on April 6, 2017.   (*Id*. at 60, 90.)   On April 25, 2017, she requested a hearing before an Administrative Law Judge (ALJ).   (*Id*. at 93-94.)   She appeared and testified at a hearing on April 23, 2018. (*Id*. at 34-58.)   On July 26, 2018, the ALJ issued a decision

finding that she was not disabled and denying her claims for benefits. (*Id*. at 14-27.)

Plaintiff appealed the ALJ's decision to the Appeals Council on August 17, 2018. (*Id*. at 167.) The Appeals Council denied her request for review on May 7, 2019, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 5.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* docs. 1; 17.)

**B.    Factual History**

    **1.    Age, Education, and Work Experience**

Plaintiff was born on December 8, 1958, and had a ninth-grade education and past relevant work experience as a cylinder press operator helper, a cashier, and a bus driver. (*Id*. at 45, 50-52, 59.)

    **2.    Medical Evidence**

On January 8, 2009, Plaintiff presented to Bander Family Medical Clinic (Bander) to be evaluated for hypothyroidism. (*Id.* at 303.) Her examination revealed memory loss and poor concentration, but she was pleasant, in no apparent distress, and well-developed and nourished with good attention to hygiene and body habitus. (*Id*.) Some depression was noted, but Plaintiff stated that it was "not bad, the trazadone helps." (*Id*.) She was prescribed low dose Prozac and instructed to return to the clinic for follow up. (*Id*. at 304.)

On February 6, 2009, Plaintiff presented to Bander for anxiety attacks and depression. (*Id*. at 305.) Her condition had existed for more than one month but was improving with medication. (*Id*.) Plaintiff was diagnosed with hypothyroidism and fatigue/malaise, and her prescription for Prozac was increased to 20mg, she was prescribed Trazadone for sleep, and she was instructed to return to the clinic within one month. (*Id*. at 306.)

On December 1, 2009, Plaintiff presented to Bander for evaluation of her

hypothyroidism. (*Id*. at 309.) Examination revealed depression, anxiety, and malaise, but she otherwise was pleasant, in no apparent distress, and well-developed and nourished with good attention to hygiene and body habitus. (*Id*.) A psychiatric examination revealed "mood and affect appropriate to situation." (*Id*. at 310.)

On January 4, 2010, Plaintiff presented to Bander for anxiety that had persisted for one month but was improving with medication. (*Id*. at 313.) She was negative for depression but had anxiety, and she was pleasant and well-developed and nourished with good attention to hygiene and body habitus. (*Id*.) Her mood and affect were appropriate. (*Id*. at 314.) Plaintiff was to return for a follow up within a few months. (*Id*.)

On February 24, 2010, Plaintiff presented to Bander for hypothyroidism. (*Id*. at 311.) She was negative for depression, did not have suicidal thoughts, and indicated that the Prozac was helping. (*Id*. at 311-12) Her mood and affect were "calm and tearful." (*Id*. at 312) Plaintiff was prescribed Trazadone and Prozac and scheduled to return in six months for a follow up. (*Id*.)

On September 20, 2011, Plaintiff saw Carol Kick, RN MS FNPC (Nurse Practitioner) with complaints of anxiety, depression, insomnia, and tearfulness, but she denied suicidal thoughts or planning. (*Id*. at 332.) Her symptoms included excessive sweating, depressed mood and feelings of impending doom, fatigue, poor concentration, indecisiveness, appetite change, poor sleep, headaches, irritability, anxiety, racing thoughts, social difficulties, employment difficulties, and financial difficulties. (*Id*.) Plaintiff indicated that her symptoms were relieved by antidepressants. (*Id*.)  She was prescribed Mirtazapine and instructed to stop taking Trazadone, and to call for rapidly improving or worsening symptoms. (*Id*. at 333.)

On May 18, 2011, Plaintiff saw Nurse Practitioner for hypothyroidism and depression. (*Id*. at 349.) Her symptoms included anxiety and excessive worry; the onset of which was sudden

3

and occurred after a social event. (*Id.*) Symptoms were exacerbated by stress and new situations and were relieved by isolation. (*Id.*) Her current treatment plan included selective serotonin reuptake inhibitors. (*Id.* at 349.) She was prescribed Klonopin for anxiety attacks, and it was recommended that she seek counseling for her anxiety and depression. (*Id.* at 351.)

On June 7, 2011, Plaintiff saw Nurse Practitioner for wrist pain, anxiety, depression, feelings of hopelessness, panic attacks and tearfulness. (*Id.* at 343-44.) The onset of her symptoms was gradual; they occurred daily and were described as severe and worsening. (*Id.* at 343.) Plaintiff was depressed, tearful/cried easily, had appropriate emotional responses, was well-groomed, and had good eye contact. (*Id.* at 344.) She was prescribed Cymbalta and was to return for a follow up in three weeks. (*Id.*)

On June 24, 2011, Plaintiff saw Nurse Practitioner for depression and fatigue. (*Id.* at 340.) Pertinent negatives included "suicidal ideation, suicide attempt, sense of failure and poor concentration." (*Id.*) Plaintiff's symptoms were described as mild and improving; she was "doing a lot better[ and was] not anxious and tearful as she was last visit[.]" (*Id.* at 341.) Plaintiff was overall oriented to person, place and time, had an overall normal mood and affect, appeared well-groomed, and had good eye contact. (*Id.*) She was instructed to follow up in a few months, but if symptoms worsened, she needed to return. (*Id.*)

On December 17, 2011, Plaintiff saw Dr. Dustin Thrash, M.D., for a medical report for disability. (*Id.* at 356-61.) She was alert, had good eye contact, and fluent speech; her mood was appropriate; and she had a clear thought process. (*Id.* at 358-59.) Her memory was normal, and she was oriented to time, place, person and situation, but her "concentration was not good." (*Id.* at 359.) Dr. Thrash opined that Plaintiff could be expected to sit and stand normally in an 8-hour workday with normal breaks, and had no relevant communicative or work place environmental

limitations, but she had some relevant visual limitations due to decreased visual acuity. (*Id*. at 361.)

On January 3, 2012, Plaintiff saw Dr. Linda S. Ludden, Ed. D., for a clinical interview/mental status exam. (*Id*. at 363.) Her chief complaints were mood disturbance and health ailments. (*Id*.) Plaintiff's appearance was clean and appropriate for her age, her hygiene was good, grooming was average, and she was alert through the interview. (*Id*.) She presented as cooperative in answering questions and completing tasks requiring minimal cognitive investment, and she was open to those requiring more thought. (*Id*.) Plaintiff reported that she had a driver's license, drove herself to the appointment, and was not accompanied by anyone. (*See id*.) She also reported symptoms of panic disorder without agoraphobia, including recurrent unexpected panic attacks, and at least one attack was followed by persistent concern about consequences or significant change in behavior related to the attack. (*Id*. at 365.) She reported five or more of the DSM-IV-TR depressive symptoms, including feeling depressed for most of the day, little to no interest or pleasure in daily activities, significant decrease in appetite nearly every day, insomnia or hypersomnia, feeling worthless, diminished ability to think or concentrate, and recurrent thoughts of death. (*Id*.) Plaintiff could care for her personal needs, was able to complete simple chores to maintain her residence, could handle her own finances, experienced moderate anxiety while shopping for groceries, and dealt poorly with unexpected changes. (*Id*.) She reported that she had two friends that she got along with well, and that she got along well with people in authority. (*Id*.) She also reported that she had difficultly starting tasks on her own initiative, and had difficulty finishing tasks in a timely and appropriate manner. (*Id*.) During the examination, Plaintiff made good eye contact; her thought process was logical and goal-oriented; her mood was depressed and tearful; she was oriented to person, place, time and

situation; and her remote memory was satisfactory, but her short-term memory was poor. (*Id*. at 366-67.) Plaintiff could complete the concentration exercises such as spelling "world" forwards and backwards, but she was slow and delayed in completing the concentration tasks. (*Id*. at 367.) She was diagnosed with major depressive disorder, generalized anxiety disorder, and panic disorder without agoraphobia, and her prognosis was poor. (*Id*. at 367-68.)

On May 12, 2016, Plaintiff saw Nurse Practitioner for anxiety, face to face HH, and COPD. (*Id*. at 463.) She reported that her anxiety symptoms occurred every day, and that the related symptoms were fairly controlled. (*Id*. at 463.) She presented with anxious/fearful thoughts, depressed mood, and fatigue and restlessness, but she denied compulsive thoughts. (*Id*.) Her anxiety was worsened by conflict, stress, and social interactions. (*Id*.) Plaintiff's treatment plan was to continue use of her current medications. (*Id*. at 466.)

On June 27, 2016, Plaintiff saw Nurse Practitioner for a follow up for depression. (*Id*. at 473.) She presented with anxious/fearful thoughts, depressed mood, and fatigue. (*Id*.) Plaintiff reported that functioning was somewhat difficult, and that her depression was aggravated by conflict or stress, and lack of sleep. (*Id*.) She had anxiety, was feeling down, depressed or hopeless, was anxious and fearful, but was oriented to time, place, person and situation. (*Id*. at 473, 476.) Her treatment plan was to resume taking Wellbutrin. (*Id*. at 473, 477.)

On December 6, 2017, Plaintiff presented to Lakes Regional MHMR for a psychological evaluation. (*Id*. 581-609.) Her facial expressions were sad, her affect was appropriate, her interview behavior was appropriate, her sight and judgment were good, and she was oriented to time, place, person and situation. (*Id*. at 603.) Her strengths included insight into problem solving and ability to maintain relationships; she was capable of independent living, and she was motivated for treatment. (*Id*. at 604.) Plaintiff was diagnosed with major depressive disorder,

panic disorder without agoraphobia, alcohol abuse, and cannabis abuse. (*Id*. at 609.)

On March 14, 2018, Plaintiff saw Dr. Darrell Horton, Ph.D., for a psychological evaluation to aid with disability determination and planning. (*Id*. at 562.) Her grooming and hygiene appeared adequate, she was slow to warm up to the session, and rapport was not easily or fully established. (*Id*. at 563-64.) She constantly had thoughts about health, finances, and bills, and these thoughts were interrupted when she was with her grandson, or if she thought of her childhood abuse. (*Id*. at 564.) Plaintiff had many pauses in her stream of thought. (*Id*.) She did some chores to take care of herself, spent most of her time in her bedroom, would drive short distances, had minimal social contact, and cried a great deal for what seemed like no immediate reason. (*Id*.) Plaintiff was articulate, coherent, and Dr. Horton could follow her train of thought. (*Id*.) Based on her history and the examination, he opined that her functional limitations included understanding and remembering detailed instructions, carrying out detailed instructions, interacting appropriately with the general public, maintaining socially appropriate behavior, performing at a consistent pace, responding appropriately to criticism from a supervisor, and dealing with normal stress. (*Id*. at 566.)

### 3.   Hearing Testimony

On April 23, 2018, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id*. at 34-58.) Plaintiff was represented by an attorney. (*Id*. at 34.)

#### a.   *Plaintiff's Testimony*

Plaintiff testified that she had completed the ninth grade and had not obtained any kind of certification or training. (*Id*. at 45.)

From 1996 through 1998, Plaintiff worked at the Dallas Morning News putting papers together, and she could handle weight up to 50 pounds. (*Id*. at 37-38.) She then worked as a

cashier at a convenience store from July 2000 through July 2006, waiting on customers, cashing them out, cleaning, stocking, bagging 20-pound bags of ice, stocking the cooler, and cleaning the parking lot. (*Id.* at 38.) She worked ten-hour days and would occasionally lift more than 20 pounds. (*Id*. at 39.) From 2006 through 2009 Plaintiff worked six hours a day as a school bus driver, but couldn't deal emotionally with the work anymore after a bus accident. (*Id*. at 39, 49.) She was unemployed from 2009 until October 2013, until she began working as a cashier in a resale store. (*Id*. at 40.) As a cashier she worked eight hours a day, lifting between 5 and 20 pounds. (*Id*. at 40-41.) She left this job after approximately six months because she "couldn't take it anymore emotionally." (*See id*.) Plaintiff testified that her boss was "really harsh" on her, and when they moved her to the back of the store, she had to climb racks, and it was "freaking [her] out." (*Id*. at 47.) She quit because "of the emotional stuff [that] was bothering [her]." (*Id*.)

Plaintiff testified that through December 31, 2011, she was facing mental health issues, including major depressive disorder, anxiety disorder, and a panic disorder with agoraphobia. (*Id*. at 43.) The mental health issues that interfered with her ability to maintain employment resulted from her mom and dad fighting, which caused a lot of drama with the family, her baby sister passing away, and helping care for her mother until her death in December 2015. (*See id*. at 42.) Mental health issues caused her not to go back to work as a cashier or some other job; she had difficulty dealing with the public and supervisors because she couldn't handle being told if she was doing something wrong and "would break down and cry." (*Id*. at 43-44.)

   b.  *VE's Testimony*

The VE testified that Plaintiff had past work experience with the closest DOT code being a cylinder press operator helper, DOT 651.686-010 (SVP 3, heavy), as a cashier, DOT 211.462-014 (SVP 3, medium), and as a school bus driver DOT 913.463-010 (SVP 4, medium).

(*Id*. at 51.)

The VE considered a hypothetical individual with the same education and work history as Plaintiff with the following limitations: she could occasionally life and carry 20 pounds, frequently lift and carry 10 pounds, would be able to stand or walk six hours in an eight-hour day with normal breaks and sit six hours a day with normal breaks. (*Id*. at 52.) She could push and pull the same as life and carry, and could occasionally balance, stoop, kneel, crouch, and crawl, but could not climb ladders, ropes, or scaffolds and no unprotected heights. (*Id*. at 53.) This individual could understand, remember, and carry out simple routine and repetitive tasks and instructions, make simple work decisions, attend and concentrate on simple tasks for extended periods with normal breaks, and was able to adapt to few changes in a routine work setting. (*Id*.) This individual would not be able to perform Plaintiff's past work, but she could work as a ticket printer and tagger, DOT 652.685-094 (SVP 2, light), with 2,800 jobs in Texas and 27,000 jobs nationally; cashier II, DOT 211.467-010 (SVP 2, light), with 8,000 jobs in Texas and 46,000 jobs nationally; and a retail marker, DOT 209.587-034 (SVP 2, light), with 2,800 jobs in Texas and 24,000 jobs nationally.   (*Id*. at 53-54.)

In response to questioning by Plaintiff's attorney, the VE testified that if an individual with mental health issues needed to take unscheduled work breaks of ten minutes, the unscheduled breaks would have "the most significant impact on [] the cashier II job." The VE also testified that the only job that possibly had a "transferability of skills down to sedentary would be the cashier checker job." (*Id*. at 56.)

C.    **ALJ's Findings**

The ALJ issued a decision denying benefits on July 26, 2018. (*Id*. at 14-27.)   At step one, he determined that Plaintiff had not engaged in substantial gainful activity since September

9

8, 2009, the alleged onset date. (*Id*. at 16.)  At step two, he found that Plaintiff had the following severe impairments: degenerative disc disease, left ankle weakness, obesity, major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia. (*Id*.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*. at 17.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work, except she could lift and/or carry 20 pounds and 10 pounds frequently; she could lift and pull the same as lift and carry; stand and/or walk and sit for six hours in an eight-hour workday with normal breaks; occasionally balance, stoop, kneel, crouch, and crawl but could not climb ladders, ropes, or scaffolds, and no unprotected heights; understand, remember, and carry out simple, routine, and repetitive tasks and instructions; could make simple work decisions, attend and concentrate on simple tasks for extended periods with normal breaks and could adapt to few changes in a routine work setting. (*Id*. at 19.) At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (*Id*. at 25.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that she was not disabled whether or not she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id*.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from September 8, 2009, through December 21, 2011. (*Id*. at 26.)

## II. LEGAL STANDARDS

Judicial review of the commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

11

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" will not be found to be disabled.

4. If an individual is capable of performing the work he had done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the

Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVEIW

Plaintiff presents two issue for review:

1. Whether the ALJ erred in failing to account for limitations resulting from Plaintiff's recognized severe impairment of panic disorder with agoraphobia.

2. Whether the ALJ's Mental RFC Finding is not Supported by Substantial Evidence.

(doc. 17 at 5.)

### IV. RFC DETERMINATION

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the

claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco*, 27 F.3d at 163-64. A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

### A.     Mental Limitations

Plaintiff argues that the ALJ "erred in failing to account for limitations resulting from [Plaintiff's] recognized severe impairment of panic disorder with agoraphobia." (*See* doc. 17 at 11.)

Here, the ALJ clearly considered the medical evidence in the record regarding Plaintiff's panic disorder with agoraphobia. (doc. 14-1 at 23.) He noted that the medical evidence supported

14

that she suffered from "major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia," but that other evidence was inconsistent with her allegations of disabling symptoms. (*Id.* at 21.) According to the medical record, Plaintiff's providers said she was pleasant, had appropriate emotional responses, was a reliable historian, had a satisfactory remote and immediate memory, denied having poor concentration, had intact judgment and insight, had a clear thought process, and was logical and goal oriented. (*Id.* at 286, 340, 350, 359, 363, 366-67.) Plaintiff had not received inpatient or outpatient mental health counseling; her depression symptoms were described as mild; she consistently presented as alert and orientated, demonstrated appropriate emotional responses, and reported that her medication was helpful in relieving her symptoms and she was "doing a lot better;" and there was a decrease in anxiety and tearfulness. (*Id.* at 309-11, 313-14, 316-18, 333, 340, 344, 358-59, 363, 366, 412, 425, 487, 491, 500.)

The medical record also indicated that Plaintiff's mental status examinations were mostly consistent throughout treatment, and she was consistently pleasant, alert and oriented, cooperative, well-groomed, and had normal speech, insight and judgment, normal memory, good attention to hygiene and body habitus. (*See id.* at 290, 294, 297, 300, 309, 332-33, 340, 359, 363, 367, 562-64.) There is also no evidence in the record showing that Plaintiff's panic disorder with agoraphobia would require greater limitations than those already found by the ALJ in the RFC determination. *See Brown v. Barnhart*, 285 F. Supp. 2d 919, 936 (S.D. Tex. 2003) (finding no error where the ALJ failed to consider alleged conditions because there was no evidence that the conditions would limit the plaintiff's ability to work).

The ALJ did not err in evaluating Plaintiff's mental impairments because he fully considered Plaintiff's complaints and relied on the medical evidence in the record in making his

15

RFC determination. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment). Remand is not required on this basis.

**B.      Substantial Evidence**

Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence. (doc. 17 at 14.)

As noted, a reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. In *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000), the Fifth Circuit held that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Id*. (citing *Switzer v. Heckler*, 742 F.2d 382, 385–86 (7th Cir. 1984); *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984); *Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994); *Armstrong v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993) ). Likewise, the substantial evidence test does not involve a simple search of the record for isolated bits of evidence that support the ALJ's decision. *Singletary v. Bowen*, 798 F.2d 818, 822–23 (5th Cir. 1986). An ALJ must address and make specific findings regarding the supporting and conflicting evidence, the weight given to that evidence, and reasons for his or her conclusions regarding the evidence. *Armstrong*, 814 F. Supp. at 1373.

The regulations require only that an ALJ consider and evaluate medical opinions. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). They do not require an ALJ to state the weight given to each symptom and diagnosis in the administrative record. *See Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept. 16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). There is no general duty of explanation or duty to provide

16

rational and logical reasons for a decision. *Escalante v. Colvin*, No. 3:14-CV-0641-G, 2015 WL 1443000, at *14 (N.D. Tex. Mar. 31, 2015) (citing cases); *Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *21 (N.D. Tex. Mar. 22, 2017) (citing *Escalante*, 2015 WL 1443000, at *14).

Here, the medical records showed that Plaintiff was pleasant and had appropriate emotional responses. (doc. 14-1 at 309, 311, 312-13, 316-17, 332-33, 340, 344.) The ALJ noted that the record showed that Plaintiff was a reliable historian, had a satisfactory remote and immediate memory, denied having poor concentration, had intact judgment and insight, had a clear thought process, and was logical and goal oriented. (*Id*. at 286, 340, 350, 359, 363, 366-67.) The ALJ also considered Dr. Thrash's consultative examination in the record showing that Plaintiff did not have any communicative or workplace environmental limitations. (*Id*. at 361.) The ALJ found that Dr. Thrash's opinion was consistent with Plaintiff's testimony about being able to return to work as a cashier for over six months in 2013, and therefore gave it significant weight. (*Id*. at 23) The ALJ also considered Dr. Ludden's diagnoses of major depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia and her opinion that Plaintiff's prognosis was poor, but he gave it partial weight because Dr. Ludden did not provide any functional limitations. (*Id*.) He also noted that Plaintiff had reported no inpatient or outpatient care to Dr. Ludden, described her symptoms as mild, and demonstrated average intelligence, intact judgment and insight, and clear thought process. (*Id*.)  Moreover, the medical records showed that Plaintiff's medications improved her symptoms. (*Id*. at 290, 304-05,312-13,332, 340, 466.) Plaintiff was able to perform activities of daily living, including cleaning, going to the grocery store, helping care for her mother, and displaying sufficient concentration and attention to drive." (*Id*. at 42, 357, 365.)

The ALJ noted that the evidence was inconsistent with Plaintiff's allegation of disabling symptoms. (*Id*. at 21.) She had no reported history of psychiatric care or outpatient mental health counseling, her depressive symptoms were described as mild, and she consistently presented as alert and orientated, denied suicidal thoughts, denied having auditory or visual hallucinations, demonstrated appropriate mood and affect, and made good eye contact.  Her medication relieved her symptoms, there was a decrease in her anxiety and tearfulness, and she reported that she was "doing a lot better." (*Id*. at 333, 340-42, 344, 359, 364, 366.)  Plaintiff's medical records also indicated that she "g[ot] along well with people in authority." (*Id*. at 365.) The ALJ noted that some of the physical and mental abilities and social interactions required in order to perform the activities that Plaintiff performed were the same as those necessary for obtaining and maintaining employment. (*Id.* at 22.)

Although Plaintiff's severe impairments included panic disorder with agoraphobia, the medical record supports the ALJ's finding that she had the mental capacity to perform the routine tasks associated with simple routine and repetitive tasks and instructions, could make simple work decisions, attend and concentrate on simple tasks for extend periods with normal breaks, and could adapt to few changes in a routine work setting. (*Id*. at 19.) Plaintiff failed to show that she is so functionally impaired by her mental impairment that she is precluded from engaging in substantial gainful activity. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir.1983) ("It must be remembered that an individual claiming disability insurance benefits under the Social Security Act has the burden of proving her disability. To meet her burden and establish disability under the Act, Plaintiff must prove that she is unable to engage in any substantial gainful activity.")

Because the ALJ relied on medical evidence in the record in making his RFC

18

determination, it was supported by substantial evidence. *See Winston v. Berryhill*, 3:16-CV-419-BH, 2017 WL 1196861, at *10–11 (N.D. Tex. Mar. 31, 2017); *see also Greenspan*, 38 F.3d at 236 (noting that in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment).

### III. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 8th day of September, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE